**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**UNITED STATES OF AMERICA**

      - against -                                 00-cr-977 (JGK)

**KEVIN ALLER,**                                        <u>**ORDER**</u>

                    **Defendant.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    The Court has received the attached letter from the defendant, which it now files. Chambers will mail a copy of this order to the defendant.

**SO ORDERED.**

**Dated:**    **New York, New York**
             **July 20, 2020**                              /s/ John G. Koeltl
                                                    **John G. Koeltl**
                                            **United States District Judge**

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

Kevin Aller                                    00cr977 (JGK)

V.

UNITED STATES OF AMERICA
                                               EXHIBIT

COME NOW THE PETITIONER, PRO SE RESPECTFULLY ASK THIS COURT TO SUBMIT THIS ATTACHED EXHIBIT IN SUPPORT OF HIS PETITION PURSUANT TO 18 U.S.C 3582 (c)(1)(A)(i)

(1) THE PETITIONER FILED A PETITION UNDER 3582 (c)(1)(A)(i) FOR COMPASSIONATE RELEASE

(2) THE SAID ATTACHMENT GIVE THIS COURT FURTHER CLARIFICATION ON THE GRAVE SITUATION AT U.S.P. LEWISBURG. AS SUCH:

(3) AS U.S.P. LEWISBURG AND THE GOVERMENT HAS BEEN GIVING THE COURT'S "A FALSE IMPRESSION" ABOUT COVID-19 AS THERE HAS BEEN NO TESTING DONE ON THE INMATES.

(1)

(4) THE OPINION FURTHER STATES BASED ON THE PRESENT RECORD, LEWISBURG IS ILLEQUIPTED TO HANDLE A COVID-19 OUT BREAK AND WAITING FOR A OUT BREAK WOULD BE TO LATE.

WHEREFORE THE PETITIONER REQUEST THAT THE SAID ATTACHMENT BE PLACED IN THE RECORD AS PERSUASIVE EVIDIENCE THAT THE PETITIONER CONTINUED CONFINEMENT IN U.S.P LEWISBURG WILL RESULT IN DEATH.

RESPECTFULLY

x Kevin Allen

---

**UNITED STATES OF AMERICA v. MICHAEL PABON**
**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
2020 U.S. Dist. LEXIS 78245
Criminal Action No. 17-165-1
May 4, 2020, Decided
May 4, 2020, Filed

---

**Counsel**  {2020 U.S. Dist. LEXIS 1}For USA, Plaintiff: ROBERT E. ECKERT, LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, PHILADELPHIA, PA; ROBERT A. ZAUZMER, UNITED STATES ATTORNEY'S OFFICE, PHILADELPHIA, PA.

**Judges:** ANITA B. BRODY, J.

Opinion

**Opinion by:**  ANITA B. BRODY

Opinion

### MEMORANDUM

We are in the midst of a massive global crisis. COVID-19 has radically altered life as we know it. A new lexicon has emerged in response to these changed conditions such that terms like "social distancing" and "flattening the curve" have become part of our everyday conversations. There are over 3.5 million confirmed cases of COVID-19 worldwide, and over 1.15 million confirmed cases in the United States.1 At this point, there is no approved cure, treatment, or vaccine to prevent it.2 People with pre-existing medical conditions-like Petitioner Michael Pabon-face a particularly high risk of dying or suffering severe health effects should they contract the disease.

Mr. Pabon is 54 years old and suffers from diabetes, hypertension, hemophilia, atopic dermatitis, gastroesophageal reflux disease, peptic ulcer, and diverticulitis. He is convicted{2020 U.S. Dist. LEXIS 2} of aiding and abetting the attempted possession with intent to distribute a mixture and substance containing a detectable amount of cocaine. The instant offense is Mr. Pabon's first contact with the criminal justice system-his record is devoid of any other convictions or arrests. Before he began serving his sentence, Mr. Pabon spent two years on pre-trial release as a result of Judge Legrome D. Davis's determination at a bond hearing that Mr. Pabon was neither a flight risk nor a danger to the community.3 During his time on pretrial release, Mr. Pabon fully complied with all Court-ordered conditions.

On April 19, 2019, Mr. Pabon self-surrendered and began serving his 46-month sentence.4 He has served nearly 14 months of his sentence, committed no disciplinary infractions, and has a projected release date of June 6, 2022. Mr. Pabon is currently an inmate at Lewisburg Camp, a minimum security camp adjacent to United States Penitentiary Lewisburg. He moves for a reduction of his prison sentence and immediate release under the "compassionate release" statute, 18 U.S.C. § 3582(c)(1)(A). He argues that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. §3582(c)(1)(A)(i).

For Mr. Pabon, nothing could be more extraordinary{2020 U.S. Dist. LEXIS 3} and compelling than this pandemic. "People with diabetes, high blood pressure or severe obesity are more likely to

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

experience dangerous symptoms if infected with COVID-19."5 This is particularly unfortunate for Mr. Pabon because he suffers from both diabetes and high blood pressure.6 According to a CDC report, "nearly 90% of adult patients hospitalized with COVID-19 in the US had one or more underlying diseases," and out of those patients 49.7% of them had hypertension and 28.3% of them had diabetes.7

These statistics become even more concerning when considered in the prison context. Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being reexamined every day as outbreaks continue to emerge and new testing efforts reveal that the rate of infection in many correctional facilities is far higher than previously{2020 U.S. Dist. LEXIS 4} imagined.8 After reviewing the law, holding oral argument, and evaluating all the evidence that has been presented, I conclude that Mr. Pabon must be granted "compassionate release."

## I. DISCUSSION

18 U.S.C. § 3852(c)(1)(A) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.9 Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term. The policy statement lists three specific examples of "extraordinary and compelling reasons," as well as a "catchall" provision if the Director of the Bureau of Prisons ("BOP") determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described."{2020 U.S. Dist. LEXIS 5} U.S.S.G. § 1B1.13, cmt. n.1(A)-(D). In addition, the policy statement provides that a sentence reduction may only be granted if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Id. § 1B1.13(2). Furthermore, the policy statement mirrors the language of § 3582(c)(1)(A) and requires a court to consider the applicable § 3553(a) factors.

Although § 3582(c)(1)(A) requires a reduction in sentence to be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded, in light of amendment to § 3582(c)(1)(A) by the First Step Act of 2018, and the Sentencing Commission's failure to "update[] its policy statement to account for the changes imposed by the First Step Act," that "the policy statement is now clearly outdated." *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Accordingly, while "the policy statement may provide 'helpful guidance' [it] does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)."10 2020 U.S. Dist. LEXIS 58718, [WL] at *4. I consider (1) whether "extraordinary and compelling reasons" exist to reduce Mr. Pabon's sentence based on the enumerated criteria in the policy statement and an independent assessment; (2) whether Mr. Pabon is a danger{2020 U.S. Dist. LEXIS 6} to the community under § 3142(g); and (3) whether the § 3553(a) factors support a sentence reduction.

### A. Extraordinary and Compelling Reasons Exist

Mr. Pabon's circumstances-particularly the outbreak of COVID-19 and his underlying medical conditions that place him at a high risk should he contract the disease-present "extraordinary and compelling reasons" to reduce his sentence.

In the policy statement, the Sentencing Commission provides three specific circumstances that qualify as "extraordinary and compelling reasons" that warrant a sentence reduction: (A) terminal

DISHOT 2

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish[]" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is at least 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the caregiver for the inmate's minor children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). The policy statement also includes a catchall provision that gives the Director of the BOP the authority{2020 U.S. Dist. LEXIS 7} to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the other three categories. Id. cmt. n.1(D).

In this case, the government concedes that Mr. Pabon's serious medical conditions qualify as one of the enumerated "extraordinary and compelling reasons" under the policy statement:

> The government acknowledges that the risk of COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," . . . as, due to his comorbidities, Pabon may be less able to protect himself against an unfavorable outcome from the disease.Resp. in Opp'n to Mot. Reduce Sentence 9, ECF No. 113 [hereinafter "Resp."] (quoting . U.S.S.G. § 1B1.13 cmt. n.1(A)). The government thus states that "this Court need not consider the suggestion that the defendant's . . . condition falls under the 'catch-all' provision of note 1(D), as the government acknowledges that [Mr. Pabon] meets the threshold test of a medical condition defined in note 1(A)" of the policy statement.11 Id. at 9 n.3.

After taking into consideration the government's concession that Mr.{2020 U.S. Dist. LEXIS 8} Pabon qualifies for one of the enumerated "extraordinary and compelling reasons" for a sentence reduction under the policy statement, the Court agrees-after an independent assessment-that Mr. Pabon has presented "extraordinary and compelling reasons" to reduce his sentence.

Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." *Extraordinary*, Black's Law Dictionary (11th ed. 2019). It defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." *Compelling Need*, Black's Law Dictionary (11th ed. 2019).

A review of the BOP's voluminous medical records for Mr. Pabon-several hundred pages-indicates that Mr. Pabon is especially vulnerable to COVID-1912 and prison is a particularly dangerous place for him at this moment.13 As the government recognizes, Mr. Pabon's comorbidities place him at high risk of grave illness or death if he gets infected with coronavirus. Both diabetes and hypertension have been identified as "specific comorbidities associated with increased risk of infection and worse outcomes."14 A recent study of 5,700 patients with COVID-19 in the New York City area reveals, "[t]he{2020 U.S. Dist. LEXIS 9} most common comorbidities were hypertension (3026; 56.6%), obesity (1737; 41.7%), and diabetes (1808; 33.8%)."15 In New York State, 89.2% of the 19,189 total fatalities caused by COVID-19 have at least one comorbidity and the top two comorbidities are hypertension (11,014 fatalities) and diabetes (7,183 fatalities).16

In addition to having two of the leading comorbidities associated with increased risk of COVID-19 infection and severe negative outcomes, Mr. Pabon is 54 years old. His age is yet another contributing factor to the increased risk he faces from COVID-19. A recent study based on data "from individuals who tested positive for COVID-19 in 38 countries . . . found that risk of death from the disease rose with each decade of age."17 In New York State, approximately 10% of fatalities occurred in people between the ages of 50 to 59, almost a threefold increase in fatalities from individuals in the next lower age group of people between the ages of 40 to 49.18

DISHOT                                   3

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

In the absence of a deadly pandemic that is deadlier to those with Mr. Pabon's underlying conditions, these conditions would not constitute "extraordinary and compelling reasons." It is the confluence of COVID-19 and Mr. Pabon's health conditions that makes this circumstance extraordinary and compelling.

Given Mr. Pabon's vulnerability to COVID-19, prison is a particularly dangerous place for him. Although the government represents that Lewisburg Camp has no cases of COVID-19, the government never says whether anyone has been tested. Only 2,700 of approximately 150,000 federal inmates in this country have been tested, and of those tested 70% have COVID-19.19 Correctional facilities that have made the decision to undertake mass testing have discovered dramatically higher numbers of infected inmates than previously imagined.20 For instance, when Montgomery County, Pennsylvania tested every inmate in custody, it discovered "a rate of infection more than 30 times greater than what Montgomery County had identified before it began its mass testing."21 Similarly, when a prison in North Carolina tested all of its{2020 U.S. Dist. LEXIS 11} inmates, it discovered that it had not 39 cases-as it had previously thought-but 444 cases.22 In both facilities, this spike was in large part due to the number of infected inmates who have been asymptomatic.23

Despite the BOP's lack of testing, several virus hotspots have emerged and the BOP's reported cases of COVID-19 are drastically growing. For instance, at FCI Terminal Island, 620 out of 1,051 inmates have tested positive and five inmates have died.24 While the BOP reported only eighteen known cases of COVID-19 among inmates and staff as of March 26, 2020,25 the BOP now reports that{2020 U.S. Dist. LEXIS 12} 1,926 inmates and 350 BOP staff "have confirmed positive cases" and 515 inmates and 148 staff have recovered, while 38 inmates have died.26 Because the BOP has tested so few inmates, however, these statistics almost certainly underestimate the true number of infections and the number of affected BOP facilities. According to Leonard Rubenstein, a professor at Johns Hopkins Bloomberg School of Public Health, "Unless you do universal testing in all environments, the risk of spread is enormous. If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on. . . . It's too late."27

Without mass testing-and any detailed information about the current conditions at the Lewisburg Camp-the Court may be getting a false picture. If the Court waits to act until the BOP confirms its first case of COVID-19 at Lewisburg, it may be too late for vulnerable inmates like Mr. Pabon. The Court is not willing to take that risk.

Prisons are ill-equipped to prevent the spread of COVID-19. Many of the recommended measures{2020 U.S. Dist. LEXIS 13} to prevent infection are impossible or unfeasible in prison. Public health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer.28 Joseph J. Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate transmission.29

DISHOT                                    4

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Lewisburg is particularly ill-equipped to contain the virus at this time. The BOP has implemented modified operations "to mitigate the spread of COVID-19."30 As part of these measures, the BOP represents that "inmate internal movement is suspended with limited exceptions."31 USP Lewisburg, however, appears to be an exception. In mid-April, the BOP began transferring 900 prisoners from a tornado-damaged facility to USP Lewisburg.32 The influx of people coming to USP Lewisburg further reduces the ability of the BOP to protect inmates like Mr. Pabon from exposure to COVID-19.

The BOP cannot adequately protect Mr. Pabon from infection. Mr. Pabon's physical vulnerabilities in light of this pandemic constitute reasons for reducing his sentence "[b]eyond what is usual, customary, regular, or common," and reasons "so great that irreparable harm or injustice would result if [the relief]{2020 U.S. Dist. LEXIS 15} is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling Need*, Black's Law Dictionary (11th ed. 2019). Based on the government's concession and the Court's independent assessment, Mr. Pabon has presented "extraordinary and compelling reasons" to reduce his sentence.

### B. Mr. Pabon is Not a Danger to Others or the Community

The Commission's policy statement, which provides helpful guidance, provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

Mr. Pabon is not a danger to the safety of others or to the community under the factors listed in in 18 U.S.C. § 3142(g). Section 3142(g) sets out the factors courts must consider in deciding whether to release a defendant pending trial. These factors weigh both the defendant's possible danger to the community and the defendant's likelihood to appear at trial. Only the former is relevant here. The factors that weigh danger to the community include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past{2020 U.S. Dist. LEXIS 16} conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

In March 2017, Mr. Pabon was arrested at his home after officers watched a parcel containing drugs get delivered to his house. Presentence Investigation Report ("PSR") ¶¶ 11-19. In addition to recovering the drugs, the officers also recovered over $400,000 and a firearm from Mr. Pabon's bedroom. PSR ¶ 18. As a result, Mr. Pabon pleaded guilty to aiding and abetting the attempted possession with the intent to distribute a mixture and substance containing a detectable amount of cocaine. In his plea agreement, however, he also stipulated that he possessed one kilogram of cocaine and a firearm during the commission of the offense.33 PSR ¶ 7.

The government argues that Mr. Pabon is a danger to the community because, only three years ago, he "had a kilogram of cocaine delivered to his house, where he kept over $400,000 and a firearm." Resp. 10. While this is true, nothing in Mr. Pabon's history-including his record in prison-suggests that he has ever been violent.

A closer look at the history and{2020 U.S. Dist. LEXIS 17} characteristics of Mr. Pabon, his offense, and pretrial conduct reveal that Mr. Pabon is not a danger to the community. At the time Mr. Pabon had the firearm, he had no criminal record that prevented him from possessing a gun. Bond Hearing (Apr. 18, 2017) Tr. 39:7-14 [hereinafter "Bond Tr."]. The gun was unloaded, Bond Tr. 67:3-4, and there is no evidence that Mr. Pabon ever used or threatened to use the gun on anyone. Although drugs and a firearm were recovered from the same property, the drugs were found in standalone garage and the firearm was found in Mr. Pabon's bedroom. Bond Tr. 67:2-4, 87:22-88:6. Therefore,

DISHOT                                                      5

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Mr. Pabon's possession of an unloaded firearm in his bedroom does not establish that he is a danger to others.

In April 2017, Judge Legrome D. Davis reached the same conclusion-buttressed by Pretrial Services' recommendation of release-that Mr. Pabon was not a danger to the community. See Bond Tr. 67:13-68:7; 89:22-92:10. Accordingly, Judge Davis granted Mr. Pabon's motion for pretrial release provided that Mr. Pabon was placed on house arrest with GPS monitoring. See Bond Tr. 89:22-92:10; Bond Order, ECF No. 36. Mr. Pabon proved Judge Davis right. During his entire two years{2020 U.S. Dist. LEXIS 18} on pretrial release, Mr. Pabon complied with all court-ordered conditions of release. PSR ¶ 9.

Mr. Pabon will not be a danger to the community during this pandemic because he has a home to return to, where he can self-quarantine, and an adequate reentry plan, as verified by the Probation Office. See U.S. Probation Office Mem. (May 4, 2020). Since 2010 Mr. Pabon has been a resident of Philadelphia. PSR ¶ 50. He has resided with his wife of 30 years, and other family members, in the same home since 2012. See PSR ¶¶ 45, 50; U.S. Probation Office Mem. (May 4, 2020). It is in this home that he successfully spent two years in home confinement on pretrial release. Id. And it is in this home that he hopes to again be placed on home confinement-this time in lieu of serving any additional sentence at Lewisburg Camp. See U.S. Probation Office Mem. (May 4, 2020); Reply to Resp. in Opp'n to Mot. Reduce Sentence 5, ECF No. 114.

Absent his conviction for this offense, Mr. Pabon has been a law-abiding citizen, with a stable family, and a long, stable work history until he began receiving Social Security Disability. See Bond Tr. 32:8-34:4; 67:20-22. Mr. Pabon is 54 years old and he has no prior criminal{2020 U.S. Dist. LEXIS 19} history-both factors that greatly reduce his risk of recidivism and hence any concerns that Mr. Pabon could be a danger to the community.34

For these reasons, Mr. Pabon is not a danger to the safety of others or to the community under the factors listed in 18 U.S.C. § 3142(g).

### C. The Section 3553(a) Factors Support a Sentence Reduction

Finally, the Court must "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Section 3553(a) "contains an overarching provision instructing district courts to '*impose a sentence sufficient, but not greater than necessary*,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007) (emphasis added) (quoting 18 U.S.C. § 3553(a)). These goals include:

> the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.18 U.S.C. § 3553(a)(2). The other applicable sentencing factors the Court must consider are{2020 U.S. Dist. LEXIS 20} "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(1), (6).

The government argues that "[t]he defendant fails to demonstrate how release, 13 months into a

DISHOT 6

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

46-month sentence for a serious drug crime, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense." Resp. 10. Mr. Pabon's sentence includes not only his term of incarceration, but also his term of supervised release that follows. *See United States v. Damon*, 933 F.3d 269, 273-74 (3d Cir. 2019) (explaining that "the word 'sentence' is commonly understood to encompasses [sic] all penalties imposed on a defendant, which can include penalties beyond imprisonment," and holding that supervised release is part of the sentence imposed). By the time of his release, Mr. Pabon will have served nearly 14 months in prison. He will then serve 5 years of supervised release, two years of which will include home confinement and location monitoring until his currently projected release date of June 6, 2022. In addition, as a result of this offense, Mr. Pabon is{2020 U.S. Dist. LEXIS 21} now a convicted felon subject to a myriad of collateral consequences.35 Therefore, Mr. Pabon's reduced sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.

Mr. Pabon's reduced sentence also serves the other goals of sentencing outlined in § 3553(a). The sentence provides adequate deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). As recognized by the National Institute of Justice, "[i]ncreasing the severity of punishment does little to deter crime."36 There is no reason to think that continuing to incarcerate Mr. Pabon will protect the public from his further crimes because, as already discussed, Mr. Pabon's age and criminal history,37 as well as his physical condition, make him much less likely to recidivate. *See id.* § 3553(a)(2)(C). Moreover, rather than providing medical care, Mr. Pabon's continued incarceration might interfere with his ability to get needed medical care. *See id.* § 3553(a)(2)(D). To prolong Mr. Pabon's incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

"[T]he nature and circumstances of{2020 U.S. Dist. LEXIS 22} the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), as discussed in more detail in the previous section, also support a sentence reduction. To reiterate, however, Mr. Pabon has no prior criminal history and there are no indications of any violence in his past. He has a stable and closely connected family. And he is a 54-year-old with serious health conditions, including hypertension and diabetes-the two leading comorbidities associated with increased risk from COVID-19.

Finally, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). Mr. Pabon received a sentence within the guideline range. The most recent statistics from the United States Sentencing Commission from 2017 indicate that only 40.7% of offenders who committed drug crimes involving powder cocaine received a within range sentence, while 1.4% received an above range sentence, and 57.9% received a below range sentence.38 This Court's decision to reduce Mr. Pabon's sentence below the guideline range will not create unwarranted sentence disparities.

The applicable § 3553(a) factors support a sentence reduction for Mr. Pabon.

## II. CONCLUSION

Mr. Pabon's sentence was never intended to include a grave risk of severe illness or death from an unforeseen pandemic. For this reason, and the others elaborated here, I will grant Mr. Pabon's motion for a sentence reduction. I will sentence him to time served and five years of supervised release with the conditions that he be placed on home confinement and location monitoring until his current projected release date of June 6, 2022. Mr. Pabon will also be ordered to self-quarantine in his home for 14 days.

/s/ ANITA B. BRODY

ANITA B. BRODY, J.

DISHOT 7

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**ORDER**

**AND NOW**, this 4th day of May, 2020, it is **ORDERED** that Defendant Michael Pabon's Emergency Release Motion Re: COVID-19 Pandemic (ECF No. 109) is **GRANTED**. Mr. Pabon is **ORDERED** immediately released subject to the following:

> Mr. Pabon is sentenced to time served.
>
> Mr. Pabon remains sentenced to five years of supervised release.
>
> Mr. Pabon must self-quarantine in his home for 14 days.
>
> Mr. Pabon is placed on home confinement and location monitoring until June 6, 2022.
>
> Mr. Pabon is subject to the following special{2020 U.S. Dist. LEXIS 24} conditions of supervised release: The defendant is to be confined to his residence and must comply with the Location Monitoring Program requirements as directed by the United States Probation Office until June 6, 2022. The defendant is required to be at the residence at all times, except for approved absences for medical appointments. The location monitoring technology is at the discretion of the United States Probation Office. The cost of monitoring will be paid (either by the defendant or the United States Probation Office). The defendant shall permit the United States Probation Office access to the residence at all times and comply with any other specific conditions of home detention as his probation officer requires.

/s/ ANITA B. BRODY

ANITA B. BRODY, J.

## Footnotes

1

*COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University of Medicine Coronavirus Resource Center (accessed May 4, 2020), https://coronavirus.jhu.edu/map.html .

2

See *Coronavirus disease 2019 (COVID-19)*, Mayo Clinic (accessed Apr. 29, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/diagnosis-treatment/drc-20479976 .

3

Judge Davis determined that Mr. Pabon did not present a flight risk or a danger to the community provided that he was released on $75,000 secured bond and placed on house arrest with GPS monitoring. See Bond Hearing (Apr. 18, 2017) Tr. 89:22-92:10; Bond Order, ECF No. 36.

4

Mr. Pabon's sentence also includes 5 years of supervised release.

5

*COVID-19: Who's at higher risk?*, Mayo Clinic (accessed May 1, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301.

6

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



Because hypertension is also called high blood pressure, the terms will be used interchangeably. *See About High Blood Pressure*, Centers for Disease Control and Prevention (accessed May 1, 2020), https://www.cdc.gov/bloodpressure/about.htm .

7

*See* Karina Zaiets & Ramon Padilla, *Coronavirus, diabetes, obesity and other underlying conditions: Which patients are most at risk?*, USA Today (Apr. 15, 2020), https://www.usatoday.com/in-depth/news/2020/04/15/coronavirus-risk-90-patients-had-underlying-conditions/2962721001/ (citing Shikha Garg et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 - COVID-NET, 14 States, March 1-30, 2020*, 69 Morbidity & Mortality Weekly Report 485 (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm ).

8

*See, e.g.*, Jeremy Roebuck & Allison Steele, *Montgomery County's jail tested every inmate for COVID-19-and found 30 times more cases than previously known*, Philadelphia Inquirer (Apr. 28, 2020), https://www.inquirer.com/news/coronavirus-testing-montgomery-county-jail-asymptomatic-philadelphia-prisons-20200428.html; Kevin Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort*, USA Today (Apr. 25, 2020, updated Apr. 27, 2020), https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/ .

9

The government agrees that Pabon's motion is properly before the Court because he has complied with § 3582(c)(1)(A)'s 30-day lapse provision. *See* 18 U.S.C. § 3582(c)(1)(A) (providing that a prisoner can file a motion with the court upon the "lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility").

10

For an in-depth discussion of the interplay between the amendment to § 3582(c)(1)(A) and the policy statement, which explains this Court's reasoning here, see *Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *2-6.

11

In an opening and closing line of its brief, the government makes the conclusory assertion that Mr. Pabon "fails to present sufficient compelling and extraordinary reasons required by the statute." Resp. 12; *see also* Resp. 1 ("[Pabon's] asserted reasons are neither extraordinary nor compelling."). But the government explicitly concedes the contrary in the body of its brief by recognizing that Mr. Pabon satisfies the Sentencing Commission's definition of "extraordinary and compelling reasons." In light of that explicit concession, the government's assertion carries little weight.

12

Prior to incarceration, Mr. Pabon received Social Security Disability Benefits from the Social Security Administration-further evidence of his physical vulnerabilities. Presentence Investigation Report ¶ 72.

13

To protect the privacy of Mr. Pabon, defense counsel confidentially submitted Mr. Pabon's medical records to the Court. The government did not object to this method of submission.

14

DISHOT 9

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Ernesto L. Schiffrin et al., *Hypertension and COVID-19*, 33 American Journal of Hypertension 373, 373 (May 2020), https://academic.oup.com/ajh/article/33/5/373/5816609 . Two studies from Wuhan, China revealed: "The most common comorbidities in one report were hypertension (30%), diabetes (19%), and coronary heart disease (8%). Another report showed that the most frequent comorbidities in patients with COVID-19 who developed the acute respiratory distress syndrome were hypertension (27%), diabetes (19%), and cardiovascular disease (6%)." *Id.* (footnote omitted).
15

Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184 .
16

*COVID-19 Tracker*, New York State Department of Health (accessed May 4, 2020), https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n .
17

Erin Schumaker, *Risk for severe COVID-19 increases with each decade of age{2020 U.S. Dist. LEXIS 10}*, abcNEWS (Apr. 1, 2020), https://abcnews.go.com/Health/risk-severe-covid-19-increases-decade-age/story?id=69914642 (citing Robert Verity et al., *Estimates of the severity of coronavirus disease 2019: a model-based analysis*, Lancet Infectious Diseases (Mar. 30, 2020), https://doi.org/10.1016/S1473-3099(20)30243-7 ).
18

*See COVID-19 Tracker, supra* note 16.
19

Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, AP News (Apr. 29, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f .
20

*See* Roebuck & Steele, *Montgomery County's jail tested every inmate for COVID-19-and found 30 times more cases than previously known*; Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort, supra* note 8.
21

*See* Roebuck & Steele, *Montgomery County's jail tested every inmate for COVID-19-and found 30 times more cases than previously known, supra* note 8.
22

*See* Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort, supra* note 8.
23

*See id.*; Roebuck & Steele, *Montgomery County's jail tested every inmate for COVID-19-and found 30 times more cases than previously known, supra* note 8.
24

*COVID-19 Cases*, Federal Bureau of Prisons (accessed May 4, 2020), https://www.bop.gov/coronavirus/index.jsp; *FCI Terminal Island*, Federal Bureau of Prisons (accessed May 3, 2020), https://www.bop.gov/locations/institutions/trm/ .

DISHOT                                              10

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25

*COVID-19 Cases, supra* note 24. (accessed Mar. 26, 2020).

26

*Id.* (accessed May 4, 2020).

27

*See* Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort, supra* note 8.

28

*See, e.g.,* {2020 U.S. Dist. LEXIS 14} *How to Protect Yourself & Others*, Centers for Disease Control & Prevention (accessed May 1, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html ; Dr. Asaf Bitton, *Social distancing in the coronavirus pandemic - maintaining public health by staying apart*, Boston Globe (Mar. 14, 2020),
https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-pandemic-maintaining-public-health-by-staying-apart/ .

29

*Declaration of Joseph J. Amon, Ph.D. MSPH* ¶ 20, Def. Reply Br. Ex. A, *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), ECF No. 134-1, also available at
https://www.aclupa.org/sites/default/files/field_documents/dr._amon_declaration_march_30_2020.pdf

30

*BOP Implementing Modified Operations*, Federal Bureau of Prisons (accessed May 1, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp .

31

*Id.*

32

Walter Pavlo, *COVID-19 and Natural Disaster Combine for Tragedy at Bureau of Prisons Facility in Estill, SC*, Forbes (Apr. 28, 2020),
https://www.forbes.com/sites/walterpavlo/2020/04/28/covid-19-and-natural-disaster-combine-for-tragedy-at-bureau-of-prisons-facility-in-estill-sc .

33

In the indictment, Mr. Pabon was charged with attempted possession with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846 (Count I), and the possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count II). In his plea agreement, Mr. Pabon pleaded guilty to aiding and abetting the attempted possession with the intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of §§ 841(a)(1), (b)(1)(C), 846, a lesser included offense of Count I. The firearm offense (Count II) was dismissed. At sentencing, however, Mr. Pabon received a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon in connection with the offense.

34

*Report-At-A-Glance: Recidivism & Federal Sentencing Policy*, United States Sentencing Commission (Mar. 2016),

DISHOT                                                     11

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf (noting that "recidivism rates generally increase as offenders' criminal history calculations increase" and "[s]tudies have repeatedly shown older offenders to have a lower risk of reoffending and the Commission's study confirmed this finding").
35

*Collateral Consequences of Conviction Project*, American Bar Association (accessed May 2, 2020), https://www.americanbar.org/groups/criminal_justice/niccc/ (cataloging "over 45,000 federal and state statutes and regulations that impose collateral consequences on persons convicted of crimes").
36

*National Institute of Justice: Five Things about Deterrence* 1, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.
37

See *Report-At-A-Glance: Recidivism & Federal Sentencing Policy*, supra note 34.
38

*Sentences Relative to the Guideline Range for Drug{2020 U.S. Dist. LEXIS 23} Offenders in Each Drug Type (Option 2: Four Categories)*, United States Sentencing Commission (accessed May 2, 2020), https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_num=Table45-4.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

LEGAL MAIL
7-5-2020

HONORABLE JOHN G. KOELTL
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET
NEW YORK, NEW YORK 10007